# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL WAYNE REEVES, | Case No. 1:20-cv-00080-SAB |
| Plaintiff, | ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL AND ENTERING JUDGMENT IN FAVOR OF DEFENDANT COMMISSIONER OF SOCIAL SECURITY |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | (ECF Nos. 12, 13, 15) |

## I.

## INTRODUCTION

Michael Wayne Reeves ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from chronic obstructive pulmonary disease ("COPD"), neuropathy, obesity, diabetes mellitus, essential tremors, and obstructive sleep apnea. For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

---

[1] The parties have consented to the jurisdiction of the United States magistrate judge and this action has been assigned to the undersigned magistrate judge for all purposes. (ECF Nos. 7, 8, 17.)

## II.

## BACKGROUND

### A.    Procedural History

On November 22, 2016, Plaintiff filed a Title II application for disability and disability insurance benefits alleging a period of disability beginning on June 16, 2016.  (AR 165-68.)  Plaintiff's claim was initially denied on July 7, 2017, and denied upon reconsideration on September 18, 2017.  (AR 78-81, 85-91.)  On October 6, 2017, Plaintiff submitted a request for a hearing before an Administrative Law Judge, and on April 23, 2019, Plaintiff appeared before Administrative Law Judge Trevor Skarda (the "ALJ"), for an administrative hearing.  (AR 28-49, 92-93.)   On September 26, 2019, the ALJ issued a decision finding that Plaintiff was not disabled.  (AR 12-27.)  On November 18, 2019, the Appeals Council denied Plaintiff's request for review.  (AR 1-6.)

Plaintiff filed this action on January 15, 2020, and seeks judicial review of the denial of his application for disability benefits.  (ECF No. 1.)  On August 24, 2020, Plaintiff filed an opening brief.  (ECF No. 12.)  On September 23, 2020, Defendant filed a brief in opposition. (ECF No. 13.)  On October 6, 2020, Plaintiff filed a reply brief.  (ECF No. 15.)

### B.    Hearing Testimony

Plaintiff testified at the April 23, 2019 hearing with the assistance of counsel.  (AR 28-49.)  Initially, the Vocational Expert Kenneth Ferra ("VE") testified regarding Plaintiff's past work, and stated an Insurance Sales Agent is classified as light and skilled, with an SVP of 6, and the position of Safety Manager is classified as sedentary and skilled, with an SVP of 8, though it appeared the position was probably performed at the light level of exertion.  (AR 32.)

Plaintiff was first examined by his counsel.  (AR 32.)  Plaintiff was sixty (60) years old, 6'4" tall, and weighed approximately 340 pounds on the date of the hearing.  (AR 32, 45-46.)  Plaintiff had previously weighed around 385 pounds.  (AR 33.)  Plaintiff confirmed that he was told to lose weight by his neurologist and pain management specialist to prepare for a potential back surgery.  (Id.)

Plaintiff lives at home with his wife.  (Id.)  Plaintiff appeared with a cane that was

prescribed by his neurologist and his pain specialist.  (Id.)  Plaintiff is left-handed, and uses the cane in his right hand.  (AR 33-34.)  Plaintiff uses the cane because he is unable to fully lift his left hand due to a shoulder injury, and uses the cane to prevent falling.  (AR 34.)  Plaintiff stated his doctors are trying to determine why he falls, and have done MRIs and other things to determine such.  (Id.)  Plaintiff testified he had fallen "like" three times since the beginning of the year, and had a very serious fall within the last year when he hit his head severely.  (Id.)  Plaintiff fell under his residence and tore the rotator cuff of the left arm.  (Id.)  Plaintiff laid there for a little while not realizing what had happened, and he assumed he was unconscious.  (Id.)  When he awoke he yelled for help and his son-in-law came and assisted him.  (Id.)

Plaintiff has had degenerative disc disease since the 1990's, and recalled injuries stemming from helping people move things, and from a previous job lifting packages.  (AR 34-35.)

Plaintiff's stated his last job was with an insurance company and he left the position because he was no longer able to write information down when he would go on walking sales routes, when he needed to write down information from potential customers.  (AR 35.)  Plaintiff also averred to ending the position because he was no longer making any money.  (Id.)  Counsel observed that Plaintiff was writing by hand during the hearing and asked what the specific issues were.  (AR 36.)  Plaintiff stated making the right impression during sales was difficult because of tremors with the left hand.  (Id.)  Plaintiff said it was also in the right hand and throughout the body, but more in the left hand.  (Id.)  Plaintiff testified it was a primary reason why he can no longer sell insurance.  (Id.)

The ALJ then interjected to have the VE testify regarding the specific line of questioning regarding leaving the insurance position. (AR 36-37.)  The ALJ presented a hypothetical person of the same age and education as Plaintiff; limited to light work; can stand and walk in combination of three hours in an eight-hour day; can frequently climb ramps or stairs; can never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; can reach overhead occasionally with the left upper extremity and frequently the upper right extremity; may handle and finger frequently with the upper right extremity, but handle and

1   finger only occasionally with the left upper extremity; and must avoid concentrated exposure to
2   pulmonary irritants, or concentrated exposure to hazards.  (AR 37.)  The VE confirmed Plaintiff
3   was left-handed, and averred that the DOT listings only relate to bilateral limitations.  (AR 38.)
4   The VE testified the insurance agent position involves frequent use of the hand.  (AR 39.)  The
5   VE testified that the hypothetical person would not be able to perform the Insurance Sales Agent
6   position, and could perform a sedentary position as a Safety Manger if they could only
7   occasionally handle and finger with the dominant hand.  (Id.)

8         Counsel then asked the VE if it would matter if the listing was sedentary, performed at
9   light, and the VE stated as far as reaching and handling it wouldn't have any effect because the
10  Safety Manager position is up on his feet, and not necessarily would be a change in the handling
11  and fingering.  (AR 39-40.)  The VE confirmed the position is a sedentary job with occasional
12  handling and fingering.  (AR 40.)

13        Counsel then asked Plaintiff to describe his work as a Safety Manager.  Plaintiff stated
14  his most recent position was Safety Supervisor with general production and was responsible for
15  safety of well-servicing rigs, and construction projects throughout the Bakersfield area.  (AR 40.)
16  Plaintiff was required to walk a lot on uneven surfaces; often climbed onto rigs to inspect them;
17  was required to write an inspection checklist, which required him to go down a checklist and
18  make notes; and people would ask why he was shaking so much because of trouble with tremors.
19  (AR 41.)  Plaintiff would conduct safety meetings and accident investigations.  (AR 41.)  To
20  investigate accidents, Plaintiff would take pictures, document evidence, and try to take notes.
21  (AR 41.)  Plaintiff stated the Safety Supervisor job involved very little sitting and was more
22  hands on, while when he worked as a Safety Manager it was somewhat more of a sedentary
23  position, though it still involved a lot of field time.  (AR 41.)  Out of the 30 years working in the
24  safety field, Plaintiff was a Safety Manager for about 18 years.  (AR 42.)

25        When asked what physical conditions preventing working as a Safety Manager now,
26  Plaintiff answered: the inability to write, the issues when going into the field, having to be
27  proactive and be in front of everybody talking, having to perform safety meetings, and the fact he
28  has to put out a message of proactiveness and of being safe.  (AR 42.)  Plaintiff was asked more

specifically about what parts of the job, and Plaintiff answered he would not be able to stand in front of a crowd for a period of time without difficulty, and would not be able to walk out in the field in the current condition and pain.  (AR 42.)  Given the VE testimony stating the job is normally done sitting, counsel asked about how Plaintiff was able to sit in the chair at the hearing, and specifically whether he could sit upright with both feet on the ground with the back straight up like a work desk.  (AR 42.)  Plaintiff stated he could do so very uncomfortably, and most of his day is spent in a recliner with the feet up, and lots of time he pulls his knees up alternating back and forth because of sciatic pain.  (AR 43.)  Plaintiff first answered that the pain preventing sitting upright had definitely been going on since the most recent fall, then when counsel asked about alleging disability beginning in August of 2016, Plaintiff clarified that he had the difficulty in 2016, but it is much more severe now.  (AR 43.)

Plaintiff began using a cane at the doctor's request about two months before the hearing.  (AR 43.)  When asked why he went to "Alexan," Plaintiff stated it was initially for tremors mainly in the dominant hand, but there was always a slight problem with the right hand as well.  (AR 43-44.)  When asked if the tremors have gotten better, Plaintiff answered the doctors told him he was maxed out on medicine and they are not going to change.  (AR 44.)

Counsel asked about how often Plaintiff laid down in 2016, and Plaintiff answered he would have to in 2016 because of pain mainly in the lower back.  (AR 44.)  Plaintiff stated he generally lays down for four to six hours a day.  (AR 44.)  When asked about whether his weight causes difficulties, Plaintiff stated he has been overweight all of his life, and was hoping it would make a big difference when he lost seventy pounds, but it has not yet.  (AR 44.)

Plaintiff has chronic obstructive pulmonary disease (COPD), uses a nebulizer every morning, and takes two medications every morning.  (AR 45.)  Plaintiff experiences dizziness when he overexerts himself.  (AR 45.)

Plaintiff's daily routine does not involve a lot of physical activity, and he is down most of the time.  (AR 45.)  Plaintiff elevates his feet for comfort and to relieve pain from sciatica.  (AR 45-46.)  Plaintiff went to the Kern Neurological Institute because of the back pain, and the doctors told him that he needed surgery but would have to lose weight before they even

considered it.  (AR 46.)

Plaintiff says he does not currently drive, does not grocery shop with his wife, does not get on a computer, gets on Facebook occasionally on a smartphone, and mainly just watches television.  (AR 46.)

The ALJ then examined the VE about Plaintiff's testimony concerning the description of the previous job.  (AR 47.)  The VE stated Plaintiff appeared to describe the position as spending more than a third (1/3) of the day in preparation of reports and taking notes, and if that is the case, then there would more than occasional handling and fingering as part of the actual performance of the job.  (AR 47.)  However, the VE confirmed that as typically performed, the Safety Manager position does not involve more than occasional handling and fingering.  (AR 47.)

The ALJ then presented a hypothetical person who could variably, but on some days, at least once a week, could less than occasionally handle and finger with the dominant hand, and asked whether that would preclude past work.  (AR 47.)  The VE Confirmed such work would be precluded.  (AR 48.)

The ALJ presented a third hypothetical person who because of a need to raise the legs above waist level throughout the course of the day, was off-task more than 15% of the time, more than nine minutes an hour, and the VE confirmed such facts would preclude past work.  (AR 48.)

The ALJ presented a fourth hypothetical with absences of two to three per month on an ongoing basis, and the VE confirmed that would preclude such work.  (AR 48.)

Counsel concluded by stating that the case is not complex, that Plaintiff is a morbidly obese man with some impairments that can catch up to you as you get older, and in combination, he would be disabled.  (AR 48.)

### C.    The ALJ's Findings of Fact and Conclusions of Law

The ALJ made the following findings of fact and conclusions of law:

- Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2020.

- Plaintiff has not engaged in substantial gainful activity since the alleged onset date of June 16, 2016.
- Plaintiff has the following severe impairments: chronic obstructive pulmonary disease, neuropathy, obesity, diabetes mellitus, essential tremors, and obstructive sleep apnea.
- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.
- Plaintiff had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can stand and walk in combination for three hours in an eight hour workday.  He can frequently climb ramps or stairs, never climb ladders, ropes or scaffolds, and occasionally stoop, kneel, crouch and crawl.  He can occasionally reach, handle, finger and feel with the left upper extremity, and frequently reach, handle, finger and feel with the right upper extremity.  He should avoid concentrated exposure to irritants such as fumes, odors, dust, gases, poorly ventilated areas, and dangerous moving machinery and unprotected heights.
- Plaintiff is capable of performing past relevant work as a safety manager.  This work does not require the performance of work-related activities precluded by the Plaintiff's residual functional capacity.
- Plaintiff has not been under a disability, as defined in the Social Security act, from June 16, 2016, through July 1, 2019.

(AR 15-23.)

## III.

## LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security Regulations set out a five-step

sequential evaluation process to be used in determining if a claimant is disabled.  20 C.F.R. § 404.1520;[2] Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004).  The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012).  "Substantial evidence" means more than a scintilla, but less than a preponderance.  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted).  "Substantial evidence is relevant evidence which, considering the record as a *whole*, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of

---

[2]  The cases generally cited herein reference the regulations which apply to disability insurance benefits, 20 C.F.R. § 404.1501 et seq., and Plaintiff is also seeking supplemental security income, 20 C.F.R. § 416.901 et seq.  The regulations are generally the same for both types of benefits.  Further references are to the disability insurance benefits regulations, 20 C.F.R. §404.1501 et seq.

1  Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

2  "[A] reviewing court must consider the entire record as a whole and may not affirm

3  simply by isolating a specific quantum of supporting evidence."  Hill, 698 F.3d at 1159 (quoting

4  Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006).  However, it is not

5  this Court's function to second guess the ALJ's conclusions and substitute the court's judgment

6  for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is

7  susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be

8  upheld.").

9                                              **IV.**

10                           **DISCUSSION AND ANALYSIS**

11         Plaintiff argues the ALJ erred by: (1) failing to provide clear and convincing reasons for

12  rejecting testimony about the loss of the ability to write; and (2) failing to resolve an apparent

13  conflict in the Dictionary of Occupational Titles ("DOT") identified by the vocational expert and

14  the description of work by Plaintiff.  (Pl.'s Opening Br. ("Br.") 5-11, ECF No. 12.)

15         **A.    Whether the ALJ Provided Clear and Convincing Reasons to Reject**
16                 **Plaintiff's Testimony**

17         1.    The Clear and Convincing Standard for Weighing Credibility

18         "An ALJ is not required to believe every allegation of disabling pain or other non-

19  exertional impairment."  Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation

20  and citations omitted).  Determining whether a claimant's testimony regarding subjective pain or

21  symptoms is credible requires the ALJ to engage in a two-step analysis.  Molina v. Astrue, 674

22  F.3d 1104, 1112 (9th Cir. 2012).  The ALJ must first determine if "the claimant has presented

23  objective medical evidence of an underlying impairment which could reasonably be expected to

24  produce the pain or other symptoms alleged."  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th

25  Cir. 2007) (internal punctuation and citations omitted).  This does not require the claimant to

26  show that her impairment could be expected to cause the severity of the symptoms that are

27  alleged, but only that it reasonably could have caused some degree of symptoms.  Smolen, 80

28  F.3d at 1282.

Second, if the first test is met and there is no evidence of malingering, the ALJ can only reject the claimant's testimony regarding the severity of her symptoms by offering "clear and convincing reasons" for the adverse credibility finding.  Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1160 (9th Cir. 2008).  The ALJ must make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony.  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004).

Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors.  Lingenfelter, 504 F.3d at 1040; Thomas, 278 F.3d at 958.  In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment."  Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284).

2.      The Parties' Primary Arguments

Plaintiff essentially summarizes the ALJ's credibility determination as follows: the ALJ found Plaintiff received conservative treatment without specifying or pointing to medical evidence that tremors have an aggressive treatment option; the ALJ observed Plaintiff remained able to engage in activities of daily living but did not list writing as one such activity; and the ALJ cited to the state agency physician opinions as supporting the RFC.  (Br. 7.)  Plaintiff argues the ALJ failed to articulate clear and convincing reasons for rejecting Plaintiff's testimony that he lacks the ability to write the reports required of a safety manager, and the Court should deem the testimony true.  (Br. 7.)

Plaintiff more specifically contends the testimony about the inability to write is material

1    and corresponds with the testimony given and the description of work identified by the VE.  (Br.

2    7.)  In this regard, Plaintiff points to regulations that provide that a person able to perform light

3    work can also perform sedentary work with two exceptions.   The regulation provides: "If

4    someone can do light work, we determine that he or she can also do sedentary work, unless there

5    are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of

6    time."  20 C.F.R. § 404.1567(b).[3]  (Br. 8.)  Plaintiff contends that fine dexterity represents a

7    different analytical frame of reference compared to the frequency of fine manipulation, and

8    directs the Court to the DOT's definition of fingering, proffered as: "Picking, pinching, or

9    otherwise working primarily with fingers rather than the whole hand or arm as in handling."

10   *Selected Characteristics of Occupations defined in the Revised Dictionary of Occupational Titles*

11   (Dept. of Labor 1993) (SCO), Appendix C, p. 3; Revised Handbook for Analyzing Jobs, p. 12–6

12   (Dept. of Labor 1991) (RHAJ).  (Br. 8.)  Plaintiff then states the DOT dataset answers the

13   regulatory distinction by addressing the issue of dexterity, RHAJ, pp. 9-1, 9-25 to 9-30 (finger

14   dexterity and manual dexterity); the DOT dataset describes Safety Manager as requiring

15   occasional handling and fingering as well as average finger and manual dexterity, DICOT

16   012.167-058 (G.P.O.), 1991 WL 646357; and aptitudes are the capacity and abilities that a

17   person must have to perform work, RHAJ, p. 9–1.  (Br. 8.)

18          Plaintiff argues he cannot engage in the dexterity requirements of the position of Safety

19

20   [3] The full text of the regulation states:

21        (a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally
        lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is
22      defined as one which involves sitting, a certain amount of walking and standing is often necessary in
        carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other
23      sedentary criteria are met.

24        (b) Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or
        carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is
25      in this category when it requires a good deal of walking or standing, or when it involves sitting most of
        the time with some pushing and pulling of arm or leg controls. To be considered capable of performing
26      a full or wide range of light work, you must have the ability to do substantially all of these activities. If
        someone can do light work, we determine that he or she can also do sedentary work, unless there are
27      additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

28   20 C.F.R. § 404.1567.

1  Manager and requests the Court find Plaintiff's testimony as ruling out the possibility to perform

2  work requiring writing or average dexterity.  (Br. 8.)

3          Defendant responds that while Plaintiff asserted he was disabled based on an inability to

4  write due to tremors in the left dominant hand, (AR 33-36), based on the record evidence, the

5  ALJ reasonably found that although limiting, Plaintiff's left hand impairment did not preclude

6  him from all manipulative activities, and reasonably found Plaintiff could use his left hand for

7  handling and fingering on an occasional basis – meaning from very little up to one-third of the

8  time, (AR 22-23).  (Def.'s Opp'n to Pl.'s Opening Br. ("Opp'n") 12, ECF No. 13; Social Security

9  Ruling (SSR) 83-10, 1983 WL 31251, at 5 (defining "occasionally")).[4]  Defendant submits that

10  the ALJ's reasoning in discounting Plaintiff's subjective symptom testimony was consistent with

11  a reasonable interpretation of the record and controlling legal authority, and is supported by the

12  opinions of State agency reviewing doctors Frye and Bobba, the benign objective medical

13  evidence, Plaintiff's daily activities, and limited treatment history.

14          The Court now turns to consideration of the parties' specific arguments to determine

15  whether the ALJ provided clear and convincing reasons for rejecting Plaintiff's testimony.

16          3.      The Court finds the ALJ Provided Clear and Convincing Reasons for Rejecting
                    Plaintiff's Testimony
17

18          In making a credibility determination, the ALJ made the following findings to support the

19  rejection of Plaintiff's testimony:

20          As for the claimant's statements about the intensity, persistence, and limiting
            effects of his symptoms, they are inconsistent because they are not fully supported
21          by the objective medical evidence and other relevant documented evidence.  The
            documented objective medical evidence, including generally normal clinical
22          findings and the claimant's relatively intact daily activities are inconsistent with

23  ───────────────
    [4] The Social Security Ruling defines the term "occasionally" as follows:

24
            "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet
25          is required "occasionally" at the sedentary level of exertion, periods of standing or walking should
            generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total
26          approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often
            and how long a person will need to be on his or her feet to obtain or return small articles.

27  Titles II & Xvi: Determining Capability to Do Other Work-the Med.-Vocational Rules of Appendix 2, SSR 83-10
    (S.S.A. 1983).
28

                                              12

1    functional limitations to the degree alleged.  Specifically, the medical evidence
2    shows that the claimant's pain and other symptoms was treated conservatively
     with prescription medication and that the claimant's condition remained stable.
3    Additionally the claimant's treatment notes show that the claimant does
     experience some pain and other symptoms but the claimant's medical records and
4    activities of daily living do not support the claimant's allegations regarding the
     persistence and severity of his alleged symptoms.  As noted earlier, he is able to
5    perform some household chores, shop, go to church and visit family.

6    (AR 22.)

7        For the reasons explained below, the Court finds the ALJ provided clear and convincing

8    reasons for rejecting Plaintiff's testimony.

9        a.    **The ALJ Properly Relied on a Lack of Objective Medical Evidence,**
              **Inconsistency with the State Medical Opinions, and Conservative Course of**
10            **Treatment in Rejecting Plaintiff's Testimony**

11       Defendant argues the ALJ properly found the record reflected minimal objective

12   evidence in support of the claimed limitations, and that Plaintiff's limited course of treatment for

13   complaints of tremors supported a determination that Plaintiff was not disabled.  Defendant also

14   argues the ALJ properly found the opinions of reviewing physicians Drs. Frye and Bobba were

15   entitled to great weight based on their consistency with the overall evidence, and the ALJ's

16   credibility determination is supported by these opinions.

17       While a lack of objective medical evidence cannot form the sole basis for an ALJ to

18   reject pain testimony, it is a proper factor the ALJ may consider in weighing a claimant's

19   testimony.  See Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) ("The fact that a

20   claimant's testimony is not fully corroborated by the objective medical findings, in and of itself,

21   is not a clear and convincing reason for rejecting it."); Burch, 400 F.3d at 680-81 ("Although

22   lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor

23   that the ALJ can consider in his credibility analysis . . . Contrary to Burch's argument, the ALJ

24   did not solely rely on the minimal objective evidence and Burch's daily activities in discrediting

25   her testimony.  Indeed, these factors were among those he relied on, however, the ALJ made

26   additional specific findings to support his credibility determination.").

27       Pointing to Plaintiff's briefing, Defendant initially emphasizes Plaintiff does not cite any

28   specific medical evidence in the record to support the disability claim, but rather only cites to the

1   ALJ's decision in arguing error.  (Opp'n 12.)  In this regard, Defendant states that substantial

2   evidence in the longitudinal record supports the ALJ's findings.  In response, Plaintiff states the

3   case turns on the subjective complaints associated with the objective finding of tremors, and that

4   Reeves lost the ability to perform the occupational requirement of writing reports.  (AR 19, 35,

5   42.)  After the ALJ recorded the inability to write as the primary reason for not being able to

6   perform past work, Plaintiff argues the ALJ did not address that critical question again and did

7   not give clear and convincing specific reasons.  (Reply 3.)

8        The ALJ made the following specific findings regarding the medical records relating to

9   Plaintiff's tremors:

> In regards to the claimant's essential tremors impairment, on July 29, 2016, the
> claimant was seen for complaint of hand tremors gradually getting worse.  Other
> than kinetic tremor on the right, postural tremor on the left, and mildly decreased
> sensation to light touch in the left lower extremity, physical exam was
> unremarkable.  Diagnosis included tremor (Exhibit 3F/10).  MRI of the brain
> taken the following month revealed mild nonspecific ischemic and/or gliotic
> white matter changes (Exhibit 3F/7).
>
> In January 2017, he reports tremors overall are worse, not responding to
> Propranolol, made it worse.  Tremor noted on exam and narrow based gait with
> no ataxia.  Diagnostic assessment included essential tremor.  Propranolol was
> stopped and he was started on Primidone (Exhibit 3F/4).  In April 2017, he
> presented for followup of worsening tremors at which time exam showed tremor
> noted, bilateral postural and kinetic tremor, left greater than right.  Primidone
> dose was increased (Exhibit 3F/l).

18  (AR 21.)

19       As cited by the ALJ, when establishing care for his tremors in July 2016, Plaintiff

20  exhibited a tremor, but had normal strength, sensation, and reflexes in his arms, hands, and

21  fingers bilaterally.  (AR 21, 334-35.)  As cited by the ALJ, the brain MRI showed "[m]ild

22  nonspecific ischemic and/or gliotic white matter changes," but "[n]o active or acute intracranial

23  abnormality [was] identified."  (AR 21, 330.)

24       In briefing, Defendant argues that thereafter, examination findings continued to show

25  normal strength and sensation in Plaintiff's arms and that in fact, examinations did not document

26  any tremors after April 2017.  (AR 385, 479, 513, 564, 567.)  Turning to these records, the Court

27  finds the Defendant's framing of these records appears largely correct, and Plaintiff has not

28  directly responded in regard to the content of these records.  Specifically, on June 7, 2017, a

1  musculoskeletal exam found decreased strength in the left upper extremity versus the right upper

2  extremity, and the history noted the "patient was diagnosed with an essential hand tremor

3  affecting the left upper extremity . . . is beginning to experience slight decrease in strength of the

4  left upper extremity likely secondary to not using the extremity . . . states he is afraid he may

5  drop the item/object that he is carrying . . . requesting temporary disability paperwork to be filled

6  out at this time." (AR 389.)  On August 31, 2017, a musculoskeletal exam showed no joint

7  deformity, erythema, or tenderness; full range of motion on all joints; and normal gait. (AR

8  479.)  A neurological exam showed normal motor, sensory, and mental status examination. (Id.)

9  On January 11, 2018, a physical exam showed strength in the bilateral extremities was 5 out of 5,

10 and sensory was decreased to light touch in the glove and stocking distribution. (AR 567.)  On

11 March 14, 2018, a physical exam again showed strength in the bilateral extremities was 5 out of

12 5, and sensory was decreased to light touch in the glove and stocking distribution. (AR 564.)

13 On January 2, 2019, a physical exam of the extremities was noted as showing no motor deficit,

14 with upper extremities by major muscle group tested, and a sensory examination was grossly

15 intact. (AR 512.)

16        Based on the information and arguments presented, the Court finds the ALJ reasonably

17 found the mild objective evidence in the record suggested that Plaintiff was not entirely

18 precluded from using his left hand for manipulative activities. (AR 21-22.)  The Court's review

19 has determined that the ALJ's summary and utilization of the records above is supported by

20 substantial evidence.  Other than generalized and vague arguments summarized above, Plaintiff

21 has not convincingly or specifically presented any argument that the ALJ's summary or analysis

22 of the medical records as discussed here was improper.  Nor has Plaintiff presented sufficient

23 evidence of objective medical records that would counter Defendant's arguments that the ALJ

24 sufficiently relied in part on the mild objective medical records.  The Court finds these were

25 proper determinations supported by substantial evidence, and while not sufficient standing alone,

26 are clear and convincing determinations when considered in conjunction with the ALJ's other

27 reasoning.  See Vertigan, 260 F.3d at 1049; Burch, 400 F.3d at 680-81.  In addition to findings

28 regarding Plaintiff's daily activities, discussed in the following subsection, the ALJ also made

1  findings regarding Plaintiff's conservative course of treatment, and relied upon the opinions of

2  the state agency physicians.

3       In regard to Plaintiff's course of treatment, the ALJ found that "[s]pecifically, the

4  medical evidence shows that the claimant's pain and other symptoms were treated conservatively

5  with prescription medication and that the claimant's condition remained stable." (AR 22.)  Prior

6  to this conclusion, the ALJ made the following statements regarding Plaintiff's treatment for

7  tremors:

8       He returned on September 9, 2016 for followup of diabetes and glucose check.
        Of note, he was placed on SSRI for anxiety, which has helped hand tremor . . .
9
        . . . In a followup visit on October 3, 2016, he complained of slight decrease in
10      strength in left upper extremity.  However, he had been started on medication for
        the tremors and would be reevaluated in three months . . .
11
        . . . In January 2017, he reports tremors overall are worse, not responding to
12      Propranolol, made it worse.  Tremor noted on exam and narrow based gait with
        no ataxia.  Diagnostic assessment included essential tremor.  Propranolol was
13      stopped and he was started on Primidone (Exhibit 3F/4).  In April 2017, he
        presented for followup of worsening tremors at which time exam showed tremor
14      noted, bilateral postural and kinetic tremor, left greater than right.  Primidone
        dose was increased (Exhibit 3F/l).
15

16  (AR 21.)

17       As to this point, Defendant additionally submits that although Plaintiff testified that care

18  providers had told him he was "maxed out on medicine" and his tremors were "not going to

19  change" (AR 44), treatment notes did not reflect such statements, rather, treatment notes

20  reflected Dr. Alexan adjusted the medication in April of 2017, and advised him to follow up in

21  four months, but Plaintiff did not return (AR 326).  (Opp'n 14.)  When Plaintiff saw a

22  neurologist for leg complaints in early 2018, Plaintiff reported a history of tremors and the

23  neurologist adjusted his medications based on a consideration of all conditions, including asthma

24  (AR 536-68), but tremors were not proffered as a primary complaint, and on examination, no

25  tremor was noted and Plaintiff had full strength in both arms (AR 564, 567).

26       In reply, Plaintiff does not directly respond to the Defendant's arguments regarding the

27  ALJ's use of a conservative course of treatment as a rationale for discounting Plaintiff's

28  testimony.  In the opening brief, Plaintiff only noted that the "ALJ stated that Reeves received

conservative treatment without specifying or pointing to medical evidence that tremors have an aggressive treatment option." (Br. 7.) Based on the ALJ's review of the overall course of treatment and exam findings, giving due deference to the ALJ, the Court finds the ALJ reasonably found Plaintiff's course of treatment to be conservative and inconsistent with testimony. The Court does not agree with Plaintiff that the ALJ was required to point to evidence that tremors have a more aggressive treatment option. Plaintiff does not provide the Court with relevant legal authority as to this point, and similarly, Plaintiff has not presented authority that shows tremors do not have a readily utilized more aggressive treatment option, or a reason for not pursuing such. C.f. Carmickle, 533 F.3d at 1162 ("[A]lthough a conservative course of treatment can undermine allegations of debilitating pain, such fact is not a proper basis for rejecting the claimant's credibility where the claimant has a good reason for not seeking more aggressive treatment . . . Carmickle testified that he does not take other pain medication because of adverse side effects. In 2003, he also indicated that he would prefer to take Relafen, which was prescribed by Dr. Patton, but his insurance does not cover this medication. Both of these assertions are supported by Dr. Patton's treatment notes . . . On this record, Carmickle's minimal treatment regime is not a proper basis for finding him non-credible.").

The Court finds the ALJ reasonably considered this conservative course of treatment while the condition remained stable, in conjunction with the lack of objective medical records. See Miner v. Colvin, 609 F. App'x 454, 454–55 (9th Cir. 2015) (unpublished) ("In making an adverse credibility determination, the ALJ properly relied on: (1) the lack of objective medical evidence supporting Miner's alleged level of pain . . . and (3) the inconsistency between Miner's allegations that her impairments were disabling and her conservative treatment and her testimony regarding daily activities.") (citations omitted); Coelho v. Colvin, 525 F. App'x 637, 639 (9th Cir. 2013) (unpublished) ("the ALJ was entitled to rely on the lack of objective medical findings" in conjunction with the lack of seeking more aggressive treatment). Further, the ALJ's findings are consistent with the opinions of the state agency physicians, which the Court now turns to.

The ALJ also found the opinions of reviewing physicians Drs. Frye and Bobba were

1   entitled to great weight based on their consistency with the overall evidence.  Here, Defendant

2   states Plaintiff has not challenged and thus waived any argument regarding the consideration and

3   weighing of the opinion evidence.  (Opp'n 12.)  Further, the opinions are uncontradicted, as the

4   record does not reflect any opinions with greater limitations, and Plaintiff's treating sources

5   never opined on Plaintiff's functional limitations.  (Opp'n 12-13.)

6          Plaintiff replies that as for Defendant's argument that the state agency reviewing

7   physicians described Plaintiff as capable of occasional use of the left dominant hand, neither Drs.

8   Frye nor Bobba addressed the quality of the function (dexterity) as opposed to the quantity of

9   function (fingering); that dexterity is important to sedentary work 20 C.F.R. § 404.1567(b); that

10  dexterity is more important to semi-skilled and skilled work than it is to unskilled work 20 CFR

11  § 404.1568(b); neither Dr. Frye nor Dr. Bobba offered an opinion on finding Plaintiff could

12  engage in the dexterous function of writing clearly and legibly for a professional handwritten

13  report; and finally that how well and how often represent two different concerns emphasized by

14  the regulatory framework both as to exertion and skill.  (Reply 3.)

15         Turning to the opinions, Drs. Frye and Bobba opined Plaintiff could occasionally use his

16  left hand.  (AR 60, 74.)  Dr. Frye opined that manipulative manipulations of the left upper

17  extremity were limited to occasional due to weakness and tremors, and Dr. Bobba opined

18  Plaintiff was limited to occasional use of the upper left extremity and frequent use with the upper

19  right extremity.  (AR 59, 74.)  The ALJ found the physician opinions supported the disability

20  determination:

21         As for the opinion evidence, State agency review physician P. Frye, MD found on
           June 29, 2017 that the objective medical evidence supported a finding that the
22         claimant could perform light work except he can stand and/or walk three hours, sit
           about six hours in an eight hour workday, and occasionally push and/or pull with
23         the left upper extremity.  He can frequently climb ramps/stairs and balance, never
           climb ladders, ropes or scaffolds, and occasionally stoop, kneel, crouch, and
24         crawl.  He can occasionally reach any direction, including overhead, handle,
           finger and feel with the left upper extremity.  He should avoid concentrated
25         exposure to extreme heat and hazards, and avoid even moderate exposure to
           fumes, odors, dusts, gases and poor ventilation (Exhibit I A).  State agency review
26         physician L. Bobba, MD made a similar modified assessment on September 13,
           2017 (Exhibit 3A).  The undersigned adopts the findings of the State Agency
27         review physicians and psychiatrists as their opinions are consistent with the
           evidence as a whole.  The functional capacity adopted herein takes full account of
28         the mild objective findings, incorporates the restrictions supported by objective

1   evidence, and accords the claimant every reasonable benefit of the doubt.

2   (AR 22.)

3   Given the ALJ's findings regarding the objective medical evidence in the record and

4   Plaintiff's course of treatment, discussed above, the Court finds the opinions of Drs. Frye and

5   Bobba support the ALJ's credibility finding that Plaintiff's symptoms were not as severe as he

6   alleged. See Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1175 (9th Cir. 2008) ("In addition, the

7   medical evidence, including Dr. Eather's report and Dr. Neville's report—which both found

8   [claimant] could perform a limited range of work—support the ALJ's credibility

9   determination."); Kallenbach v. Berryhill, 766 F. App'x 518, 521 (9th Cir. 2019) ("The ALJ

10  provided specific, clear, and convincing reasons for discounting Kallenbach's testimony,

11  including inconsistencies between Kallenbach's allegations of impairment and his medical

12  treatment records, inconsistencies between the medical opinion evidence and Kallenbach's

13  testimony, and Kallenbach's failure to seek and adhere to prescribed treatment."); Lake v.

14  Colvin, 633 F. App'x 414, 415 (9th Cir. 2016) ("The ALJ provided specific, clear, and

15  convincing reasons for the credibility assessment, including inconsistencies between Lake's

16  testimony regarding his limitations and the medical opinions and documentary evidence.");

17  White v. Colvin, 622 F. App'x 639 (9th Cir. 2015) ("The ALJ provided specific, clear, and

18  convincing reasons for the credibility assessment, including inconsistencies between White's

19  testimony regarding her limitations and the medical opinions and record."); Moncada v. Chater,

20  60 F.3d 521, 524 (9th Cir. 1995) (holding the ALJ gave valid specific reasons where a doctor

21  "believed that Moncada could do sedentary work, that Moncada said that he uses pain

22  medication infrequently, and that Moncada's testimony about his daily living activities were

23  much more limited than those reported in a disability report completed by him prior to his

24  testimony.").

25  The Court finds the ALJ has provided clear and convincing reasons for rejecting the

26  claimant's testimony.  Further, the ALJ also cited to Plaintiff's daily activities as an additional

27  reason for discounting the testimony, as discussed in the next subsection.

28  / / /

**b.      The ALJ Did not Err in Utilizing Plaintiff's Reported Daily Activities in Rejecting Plaintiff's Testimony**

There are two grounds to use daily activities for an adverse credibility finding. <u>Orn v. Astrue</u>, 495 F.3d 625, 639 (9th Cir. 2007). First, daily activities can form the basis of an adverse credibility determination if the claimant's activity contradicts his testimony. <u>Orn</u>, 495 F.3d at 639. Secondly, "daily activities may be grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.' " <u>Id.</u> (quoting <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th Cir. 1989)). The ALJ must make specific findings as to the daily activities and their transferability to conclude that the claimant's daily activities warrant an adverse credibility determination. <u>Orn</u>, 495 F.3d at 639. "[T]he mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability." <u>Orn v. Astrue</u>, 495 F.3d 625, 639 (9th Cir. 2007) (citing <u>Vertigan v. Halter</u>, 260 F.3d 1044, 1050 (9th Cir. 2001)).

Defendant argues the ALJ properly found Plaintiff's daily activities suggested he had greater functional abilities than he alleged. Specifically, Defendant contends Plaintiff's other daily activities reflect that he could perform minor grasping as both Plaintiff and his wife reported to the agency that he had no problems with personal care (AR 213, 236) – Plaintiff could perform some household chores including taking out the trash, shopping in stores for food and clothes, and driving alone (AR 19, 22, 215, 238-239), and these activities tend to show Plaintiff had greater manipulative abilities then he alleged. Defendant also emphasizes that even if Plaintiff's capacity to engage in the above activities were susceptible to a different interpretation, this Court must still uphold the ALJ's reasonable discounting of Plaintiff's claims of disabling symptoms and functional limitations.

Plaintiff responds that the examples of daily activities used by the ALJ do not relate to the need for clear and legible handwriting as: minor grasping is gross manipulation, not fine manipulation or fingering; personal care does not require fine manipulation or fingering in any dexterous function; taking out the trash, shopping, and driving do not make demands for

dexterity; and neither the ALJ nor Defendant provided a reasoned explanation of how ordinary activities of daily living provide a foundation for rejecting testimony that Plaintiff lost the ability to write reports in a workman like fashion.  (Reply 3.)  Thus, Plaintiff argues the ALJ did not specifically address the ability to write, and Defendant does not defend the ALJ's failure to specifically address the separate dexterous function within the quantitative function of occasional fingering.

The ALJ made the following findings and comments regarding Plaintiff's testimony, using the reported daily activities as one of multiple factors in discounting the testimony:

> The claimant alleges his essential tremors, asthma, diabetes, extreme sleep apnea, severe depression, high blood pressure, and chronic obstructive pulmonary disease (COPD) prevents him from working.  The claimant indicates in his function report that he watches television and talks with his family.  He has no problem with personal care.  He does not prepare his own meals, [but] takes out the trash, goes outside, shops in stores, and socializes with others.  However, he reported difficulty lifting, standing, stair climbing, concentrating, and using his hands.  He indicated that he cannot grab or lift, and he needs to rest of [sic] walking or standing.  Yet, he indicated that when he goes outside, he walks or drives a car, and he is able to go out alone.  He can handle financial business affairs, spends time with others once a week, and he is able pay attention, finish what he starts and follow instructions (Exhibits 3E; 7E) . . .

> . . . As for the claimant's statements about the intensity, persistence, and limiting effects of his symptoms, they are inconsistent because they are not fully supported by the objective medical evidence and other relevant documented evidence.  The documented objective medical evidence, including generally normal clinical findings and the claimant's relatively intact daily activities are inconsistent with functional limitations to the degree alleged.  Specifically, the medical evidence shows that the claimant's pain and other symptoms was treated conservatively with prescription medication and that the claimant's condition remained stable.  Additionally the claimant's treatment notes show that the claimant does experience some pain and other symptoms but the claimant's medical records and activities of daily living do not support the claimant's allegations regarding the persistence and severity of his alleged symptoms.  As noted earlier, he is able to perform some household chores, shop, go to church and visit family.

(AR 19, 22.)

While Plaintiff's arguments have some merit in that the ALJ arguably could have connected the relationship between the daily activities and the specific functional limitations that the Plaintiff testified regarding in greater detail, the Court finds the ALJ did not err in the citation of the reported daily activities as one of the reasons to discount the testimony.  The ALJ described the specific relevant limitations that Plaintiff testified regarding, and then cited specific

1    daily activities that can be reasonably found to discount such testimony.  The ALJ's description

2    of the activities reported by Plaintiff appear accurate, and Plaintiff does not dispute such.  The

3    ALJ's rejection of Plaintiff's testimony based in part on the testimony of daily activities is a clear

4    and convincing reason based on substantial evidence.  "Although the evidence of [Plaintiff's]

5    daily activities may also admit of an interpretation more favorable to [Plaintiff], the ALJ's

6    interpretation was rational, and '[w]e must uphold the ALJ's decision where the evidence is

7    susceptible to more than one rational interpretation.' "  Burch, 400 F.3d at 680–81 (9th Cir.

8    2005) (citation omitted); see also Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) ("It is

9    true that Rollins' testimony was somewhat equivocal about how regularly she was able to keep

10   up with all of these activities, and the ALJ's interpretation of her testimony may not be the only

11   reasonable one.  But it is still a reasonable interpretation and is supported by substantial

12   evidence; thus, it is not our role to second-guess it.").  Further, even if the reliance on the daily

13   activities was error, given the Court's findings in the previous subsection, it would be harmless

14   as "the ALJ's remaining reasoning *and ultimate credibility determination* were adequately

15   supported by substantial evidence in the record."  Carmickle, 533 F.3d at 1162 (emphasis in

16   original).

17          **B.      Whether the ALJ Erred by Failing to Resolve an Apparent Conflict with the
                      Dictionary of Occupational Titles**
18

19          Plaintiff argues the ALJ erred by failing to resolve an apparent conflict in the Dictionary

20   of Occupational Titles ("DOT") identified through the vocational expert (the "VE") and the

21   description of work provided by Plaintiff.  (Br. 9-11.)

22          At the beginning of the administrative hearing, Plaintiff's counsel asked the ALJ whether

23   the VE could classify Plaintiff's past work, and the ALJ then asked the VE to describe Plaintiff's

24   past work and state whether the VE's testimony departs from the DOT at any point.  (AR 32.)[5]

25

26   _____
     [5] The transcript is a bit unclear as to the precise reason counsel requested this at the beginning of the hearing, but in
     relevant part counsel asked: "Your Honor, I was wondering, if in this case we could -- I could hear [the VE] classify
27   the work, because of his age and – because at 3A they list . . . him at sedentary and then they."  (AR 32.)  The ALJ
     then stated: "I don't have a problem with that.  They have him at light, standing and waling 3, but per – yeah.  So,
28   would you please describe the claimant's past work and if your testimony departs from the DOT at any point, let me
     know, okay, Mr. Ferra.?"  (AR 32.)

                                                             22

1  The VE then identified one of Plaintiff's past positions as Safety Manager (DOT 012.167-058),

2  sedentary and skilled, with a Specific Vocational Preparation ("SVP") of 8.  (AR 32.)

3          Plaintiff directs the Court to the DOT which describes the position of Safety Manager as

4  follows:

> Plans, implements, and coordinates program to reduce or eliminate occupational
> injuries, illnesses, deaths, and financial losses: Identifies and appraises conditions
> which could produce accidents and financial losses and evaluates potential extent
> of injuries resulting from accidents. Conducts or directs research studies to
> identify hazards and evaluate loss producing potential of given system, operation
> or process. Develops accident-prevention and loss-control systems and programs
> for incorporation into operational policies of organization. Coordinates safety
> activities of unit managers to ensure implementation of safety activities
> throughout organization. Compiles, analyzes, and interprets statistical data related
> to exposure factors concerning occupational illnesses and accidents and prepares
> reports for information of personnel concerned. Maintains liaison with outside
> organizations, such as fire departments, mutual aid societies, and rescue teams to
> assure information exchange and mutual assistance. Devises methods to evaluate
> safety program and conducts or directs evaluations. Evaluates technical and
> scientific publications concerned with safety management and participates in
> activities of related professional organizations to update knowledge of safety
> program developments. May store and retrieve statistical data, using computer.

15  012.167-058 SAFETY MANAGER, DICOT 012.167-058, 1991 WL 646357.  Plaintiff directs

16  the Court to his function report that describes how he previously supervised the safety of

17  employees, managed a safety program in a prior occupation, held the title of project safety

18  supervisor in a remote job, and until 2005, was responsible for safety and promoted sales and

19  service.  (Br. 9; AR 226, 227-28, 229, 230.)  Plaintiff then directs the Court to his testimony

20  describing how he performed his work as a "Safety Supervisor" as follows:

> [M]y job as Safety Supervisor with general production was to perform -- was the
> responsibility for safety for well-servicing rigs, okay, and construction projects
> throughout the Bakersfield area, okay.  This required me to walk, a lot of times on
> uneven surfaces to rigs.  Required me to, a lot of times climb up onto the rigs and
> inspect the rigs.  This also required me to write, this was an inspection checklist
> that we had, that we had to -- that every rig had to be inspected on a weekly basis,
> at least by me.  And this required me to go down this list and check it off and
> make notes, okay, and I – at this time I was also having difficulty.  Other people
> asking me, Mike, why are you shaking so much, right?  I was having trouble at
> that time also with the tremors.   Then also required me to perform safety
> meetings, you know, and also all of the accident investigations and -- which
> luckily, I'm very proud of.  Didn't have any injuries.

28  (AR 40-41.)

1        Plaintiff states that in this position as actually performed, he did not perform any of the

2  duties described above in the DOT.  Specifically, Plaintiff argues he did not: (1) develop a safety

3  program; (2) develop accident-prevention and loss-control systems and programs for

4  incorporation into operational policies of organization; (3) coordinate safety activities of unit

5  managers to ensure implementation of safety activities throughout organization; (4) compile,

6  analyze, and interpret statistical data related to exposure factors concerning occupational

7  illnesses and accidents and preparation of reports for information of personnel concerned; (5)

8  maintain liaison with outside organizations, such as fire departments, mutual aid societies, and

9  rescue teams to assure information exchange and mutual assistance; (6) devise methods to

10  evaluate safety program and conduct or direct evaluations; or (7) evaluate technical and scientific

11  publications concerned with safety management and participates in activities of related

12  professional organizations to update knowledge of safety program developments.  (Br. 10.)

13        Based on this information, Plaintiff proffers that after he described his job duties in

14  response to the VE testimony, the ALJ then had a duty to resolve the conflict.  Plaintiff argues

15  the ALJ "did not have a substantial evidentiary basis that [Plaintiff] performed the professional

16  in-office work of a safety manager as opposed to the unity implementer of safety programs with

17  inspection duties." (Br. 10.)  Plaintiff states "the occupation identified by the vocational expert

18  has little in common other than *safety* with the duties actually performed."  (Id.)  Plaintiff

19  emphasizes that in assessing the correct DOT description, the Commissioner cautions to "not

20  rely solely upon the [job] title."  POMS DI 25015.017(D), *available* at

21  https://secure.ssa.gov/poms.NSF/lnx/0425015017 (last visited March 4, 2021).[6]  Plaintiff argues

22

23  [6]  The document provides the following guidance as to Step 1 in completing a transferability of skills assessment ("TSA"):

24      Step 1 -- Review the claimant's job description, but do not rely solely upon the title. Note the

25      processes, tools, machines, and materials used and the products or services that result from the claimant's efforts. Identify skills that may be useable in other work.

26      Social Security Ruling 82-41 states that "[t]he claimant is in the best position to describe just what he or she did in PRW, how it was done, what exertion was involved, what skilled or semiskilled work

27      activities were involved, etc. Neither an occupational title by itself nor a skeleton description is sufficient."

28      Use the claimant's own job description to determine what skills have been acquired.

that substantial evidence does not support the ALJ's finding that Plaintiff could perform his past relevant work as generally performed in the national economy, and not only do the duties fail to match, no evidence permits the inference that Plaintiff possessed the range of skills required of a Safety Manager as described in the DOT.

Defendant responds that the ALJ's step 4 finding that Plaintiff could return to past relevant work is supported by Plaintiffs own reports and hearing testimony, the ALJ's reliance on the VE testimony was proper and reasonable, and that Plaintiff misuses the applicable legal authority about an ALJ's obligation to resolve apparent or obvious conflicts between the VE's testimony and the DOT.  Defendant contends that Plaintiff fails to establish that any conflict exists—much less one that is apparent or obvious.  Specifically, the ALJ found that Plaintiff could return to his past relevant work as a Safety Manager as that occupation was generally performed in the national economy, and while Plaintiff challenges this conclusion by arguing that the evidence did not support the ALJ's characterization of his past relevant work as a Safety Manager, Plaintiff cites no authority for the proposition that a claimant needed to perform all the duties outlined in the DOT's narrative description, and is mistaken in such assumption.

The Court agrees with Defendant.  When there is an apparent conflict between VE testimony and the DOT, the ALJ must generally obtain a reasonable explanation for the conflict. Massachi v. Astrue, 486 F.3d 1149, 1152–53 (9th Cir. 2007) (holding that in light of SSR 00-4p, an ALJ may not rely on a VE testimony regarding the requirements of a particular job without first inquiring whether the testimony conflicts with the DOT).  The relevant policy interpretation ruling provides:

> Resolving Conflicts in Occupational Information
>
> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to

---

POMS DI 25015.017(D), *available* at https://secure.ssa.gov/poms.NSF/lnx/0425015017 (last visited March 4, 2021).

fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

Policy Interpretation Ruling : Titles II & Xvi: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions, SSR 00-4P (S.S.A. Dec. 4, 2000), 2000 WL 1898704.  The Ninth Circuit has further elaborated on the duty of the ALJ to resolve such conflicts:

When there is an apparent conflict between the vocational expert's testimony and the DOT—for example, expert testimony that a claimant can perform an occupation involving DOT requirements that appear more than the claimant can handle—the ALJ is required to reconcile the inconsistency. *Massachi v. Astrue,* 486 F.3d 1149, 1153–54 (9th Cir.2007).  The ALJ must ask the expert to explain the conflict and "then determine whether the vocational expert's explanation for the conflict is reasonable" before relying on the expert's testimony to reach a disability determination. *Id.; see also* Social Security Ruling 00–4P, 2000 WL 1898704, at *2 (Dec. 4, 2000).  The ALJ's failure to resolve an apparent inconsistency may leave us with a gap in the record that precludes us from determining whether the ALJ's decision is supported by substantial evidence. *See Massachi,* 486 F.3d at 1154 (stating that "we cannot determine whether the ALJ properly relied on [the vocational expert's] testimony" due to unresolved occupational evidence).

Zavalin v. Colvin, 778 F.3d 842, 846 (9th Cir. 2015).

"In order to look at the millions of jobs in the U.S. economy in an organized way, the DOT groups jobs into 'occupations' based on their similarities and defines the structure and content of all listed occupations."  DOT, Parts Of The Occupational Definition, 1991 WL 645965.  As Defendant highlights, the DOT does not purport to individually identify and describe each specific job in the economy.   "Occupational definitions are the result of comprehensive studies of how similar jobs are performed in establishments across the nation and are composites of data collected from diverse sources."  Id.  "The term 'occupation' as used in the DOT, refers to this collective description of a number of individual jobs performed."  Id.  The Ninth Circuit's discussion explaining this framework and when a conflict may be considered apparent or obvious given the potentially broad description of job duties falling under an occupation, is particularly instructive given Plaintiff's arguments here pertaining to the position

of Safety Manager:

> To begin with, it's important to keep in mind that the *Dictionary* refers to "occupations," not to specific jobs. "Occupation" is a broad term that includes "the collective description" of "numerous jobs" and lists "maximum requirements" of the jobs as "generally performed." SSR 00-4P, 2000 WL 1898704, at *2–3. Because of this definitional overlap, not all potential conflicts between an expert's job suitability recommendation and the *Dictionary's* listing of "maximum requirements" for an occupation will be apparent or obvious. And, to reiterate, an ALJ need only follow up on those that are.
>
> The *Dictionary's* definition of "cashier" illustrates the definitional overlap. It's a windy, highly technical, 1000-word effort that specifies that a cashier may need to "reach frequently," but also be able to read "adventure stories and comic books," write in "cursive," "interpret bar graphs," and follow "instructions for assembling model cars." *Dictionary, 211.462-010 (Cashier II)*, 1991 WL 671840 (1991). While the ability to read, write, and follow assembly instructions may roughly correlate to the aptitude necessary to perform some cashiering jobs, those abilities aren't necessarily essential for most cashiers. Indeed, the examples given by the *Dictionary*—"Cafeteria Cashier," "Store Cashier," "Change-Booth Cashier"— contemplate such mundane functions as making change, operating a cash register, selling tickets, and scanning Universal Product Codes—none of which require overhead reaching. *Id.*; *see also Guidelines for Retail Grocery Stores: Ergonomics for the Prevention of Musculoskeletal Disorders*, U.S. Department of Labor, 10, 17–18 (2004), www.osha.gov/Publications/osha3192.pdf (noting a cashier should "work with items at about elbow height").
>
> For a difference between an expert's testimony and the *Dictionary's* listings to be fairly characterized as a conflict, it must be obvious or apparent. This means that the testimony must be at odds with the *Dictionary's* listing of job requirements that are essential, integral, or expected. This is not to say that ALJs are free to disregard the *Dictionary's* definitions or take them with a grain of salt—they aren't. But tasks that aren't essential, integral, or expected parts of a job are less likely to qualify as apparent conflicts that the ALJ must ask about. Likewise, where the job itself is a familiar one—like cashiering—less scrutiny by the ALJ is required.
>
> Here, the ALJ didn't err because there was no apparent or obvious conflict between the expert's testimony that Ms. Gutierrez could perform as a cashier, despite her weight bearing and overhead reaching limitations with her right arm, and the *Dictionary's* general statement that cashiering requires frequent reaching. While "reaching" connotes the ability to extend one's hands and arms "in any direction," SSR 85-15, 1985 WL 56857, at *7 (1985), not every job that involves reaching requires the ability to reach overhead. Cashiering is a good example.

Gutierrez v. Colvin, 844 F.3d 804, 807–08 (9th Cir. 2016).

Given these standards, the Court agrees with Defendant that the fact Plaintiff did not perform every duty enumerated in the DOT description of the position of Safety Manager is unsurprising and does not mean his past work was improperly classified.

Additionally, and more significant in determining whether the ALJ's ultimate

determinations are proper, the Court finds substantial evidence supports the ALJ's classification of Plaintiff's past relevant work as that of Safety Manager.  Defendant proffers that Plaintiff's own reports and hearing testimony support this classification.  See SSR 82-62, 1982 WL 31386 ("The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work.").  In this regard, in reports submitted to the agency, Plaintiff indicated he had performed multiple jobs involving "Oilfield Maintenance and Construction Safety," or "Oil Well Servicing and Construction Safety."  (AR 194, 201, 223.)  Plaintiff characterized these jobs' titles as "Safety Supervisor" or "Safety Manager."  (AR 181, 279.)  Plaintiff indicated he had "[s]upervised [the] safety of employees" and "[m]anaged [a] safety program."  (AR 226-30.)  Plaintiff testified he had worked as both a Safety Supervisor and a Safety Manager, stating: "I worked both positions, a Safety Supervisor is a hands-on type . . . I worked as a Safety manager where I've had up to like eight safety supervisors working under me."  (AR 40-41.)  Plaintiff stated he "was a Safety Manager for probably, out of my 30 years of safety, probably 18 years."  (AR 42.)  Plaintiff indicated his work involved performing safety inspections, safety meetings, and accident investigations.  (AR 40-41.)

Based on this testimony and reporting by Plaintiff regarding his past work, Defendant argues Plaintiff's own description of his work in safety—regardless of whether it was as a "supervisor" or as a "manager"—reflects the duties in the DOT's description of Safety Manager.  The Court agrees.  For example, the DOT's description describes identifying and appraising conditions which could produce accidents, and evaluating the potential extent of injuries resulting from accidents, which is akin to Plaintiff's testimony of performing safety inspections and accident investigations (AR 40-41).  See 012.167-058 SAFETY MANAGER, DICOT 012.167-058, 1991 WL 646357.  The DOT's description also includes "[c]oordinates safety activities of unit managers to ensure implementation of safety activities throughout organization."  Id.  This is similar to Plaintiff's statement that as a Safety Manager, he had "up to like eight safety supervisors working under me."  (AR 40-41.)  Plaintiff's own description of his work is "highly probative" and supports the ALJ's classification of the work as Safety Manager.

See Matthews v. Shalala, 10 F.3d 678, 681 (9th Cir. 1993) ("Matthews' own testimony that the receiving clerk/inspector position required a combination of both sitting and standing is highly probative.").

Plaintiff's testimony describing his position supports classification of his past work as a Safety Manager.  See Gutierrez, 844 F.3d at 807–08 (" 'Occupation' is a broad term that includes 'the collective description' of 'numerous jobs' and lists 'maximum requirements' of the jobs as 'generally performed.' [citation] Because of this definitional overlap, not all potential conflicts between an expert's job suitability recommendation and the *Dictionary's* listing of 'maximum requirements' for an occupation will be apparent or obvious."); Moore v. Comm'r of Soc. Sec., 500 F. App'x 638, 640 (9th Cir. 2012) (unpublished) ("[W]e cannot conclude that the ALJ improperly classified [claimant's] past relevant work as a 'fast foods worker'—as opposed to 'fast food cook'—because [claimant] herself testified that she 'did all of it, the cashier, the cooking, the cleaning.   The ALJ's reliance on the VE's characterization of Moore's own description of her past work was entirely appropriate.").  Further, the VE testimony supports this classification.  Based on Plaintiff's work history reports and his own testimony at the hearing, the vocational expert classified Plaintiff's past work in safety as the occupation of Safety Manager (AR 32, 47).  See 20 C.F.R. § 404.1560(b)(2) (ALJ may consider and rely on vocational expert testimony and the information in the DOT).

Finally, the ALJ did ask clarifying questions after Plaintiff offered detailed testimony on his past work.  (AR 47.)  Specifically, the ALJ asked the VE whether Plaintiff's "thorough testimony . . . change[d] the past work in [the VE's] mind?" (AR 47.)  The VE explained that Plaintiff's testimony reflected that he had performed the safety manager occupation at a greater exertional level than it was typically performed, stating: "I think his description is that he's spending more than a third of the day in preparation of reports and taking notes . . . if that's the case, then there would be more than occasional handling and fingering as part of the actual performance of the job." (AR 47.)  The ALJ then responded: "But as it's typically performed, I mean, have you had experience and is it typically done with no more than occasional handling and fingering, the Safety Manager job?" (Id.)  The VE respond yes, it is in the Safety Manager

1   job.  (Id.)  The ALJ then presented a hypothetical person that could less than occasionally handle

2   and finger with the dominant hand, and the VE confirmed such person could not perform the past

3   work as generally performed.  (AR 47-48.)[7]  Thus, the VE affirmed the classification of

4   Plaintiff's past work.

5         The ALJ reasonably relied on the Plaintiff's testimony and the vocational expert's

6   testimony in classifying Plaintiff's past relevant work as Safety Manager.  The Court cannot

7   discern remandable error in failing to resolve any apparent or obvious conflict between the VE's

8   testimony and the DOT.

9   / / /

10   / / /

11   / / /

12   / / /

13   / / /

14   / / /

15   / / /

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25

---

[7] Defendant also argues that because Plaintiff was represented by counsel at the hearing, any objection has been waived.  The Court finds some merit in this argument, but finds it unnecessary to conclude any objection has been waived.  See Samuels v. Colvin, 658 F. App'x 856, 858 (9th Cir. 2016) ("Samuels failed to object to the vocational expert's testimony. Accordingly, the issue was not preserved for appeal."); Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999) ("We now hold that, at least when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal.").

1

**V.**

2

**CONCLUSION AND ORDER**

3     Based on the foregoing, the Court finds that the ALJ provided clear and convincing

4 reasons for discounting Plaintiff's testimony.  The Court further finds the ALJ did not err in

5 failing to resolve any apparent conflict between Plaintiff's testimony about past relevant work,

6 the vocational expert's testimony, and the DOT's definition of Safety Manager.  The Court finds

7 the ALJ's decision to be supported by substantial evidence in the administrative record, and free

8 from remandable legal error.

9     Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the

10 Commissioner of Social Security is DENIED.  It is FURTHER ORDERED that judgment be

11 entered in favor of Defendant Commissioner of Social Security and against Plaintiff Michael

12 Wayne Reeves.  The Clerk of the Court is DIRECTED to CLOSE this action.

13

IT IS SO ORDERED.

14

15 Dated:   **March 10, 2021**

UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28